## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| LAMARD RICHARDSON,   on behalf of himself  )<br>and all others similarly situated,  )<br>1977 Wells Creek Run,  )<br>Akron, OH 44312,  )<br>  )<br>PLAINTIFF,  )<br>  )<br>  )<br>v.  )<br>  )<br>CMFG LIFE INSURANCE COMPANY  )<br>S/A CT Corporation System,  )<br>400 E. Court Ave.,  )<br>Des Moines, Iowa, 50309,  )<br>  )<br>and  )<br>  )<br>TRUSTAGE FINANCIAL GROUP, INC.,  )<br>5910 Mineral Point Rd.,  )<br>Madison, Wisconsin 53705,  )<br>  )<br>and  )<br>  )<br>TRUSTAGE INSURANCE AGENCY,  )<br>LLC,  )<br>S/A CT Corporation System,  )<br>4400 Easton Commons Way, Suite 125,  )<br>Columbus, Ohio 43219,  )<br>  )<br>and  )<br>  )<br>JOHN DOE CORPORATION,  )<br>(Real Name and Address Currently Unknown)  )<br>  )<br>DEFENDANTS.  ) | CASE NO.: 5:24-cv-00569<br><br>JUDGE JOHN R. ADAMS<br><br>**PLAINTIFF'S FIRST AMENDED<br>CLASS ACTION COMPLAINT,<br>PURSUANT TO FED. R. CIV P.<br>15(a): BREACH OF CONTRACT,<br>BAD FAITH, FRAUD,<br>AND NEGLIGENT<br>MISREPRESENTATION**<br><br><br>(Jury Demand Endorsed Hereon) |

Now comes the Plaintiff, Lamard Richardson (hereinafter "Richardson"), on behalf of

himself and all others similarly situated, by and through counsel, and for his First Amended Complaint, pursuant to Fed. R. Civ. P. 15 (a), against the Defendants, CMFG Life Insurance Company (hereinafter "CMFG"), TruStage Financial Group, Inc. (hereinafter "TruStage Financial"), TruStage Insurance Agency, LLC (hereinafter "TruStage Insurance"), and John Doe Corporation, hereinafter collectively known as "Defendants", hereby states as follows:

## INTRODUCTION

1.      This is an action for damages against Defendants for breach of contract, bad faith, and negligent misrepresentation.  This action was originally filed at the State of Ohio, Court of Common Pleas of Summit County, case number CV-2024-02-0800.  Defendants filed their Notice of Removal on March 27, 2024, to remove this action to this United States District Court for the Northern District of Ohio under 28 U.S.C. §§ 1332(a), 1441, and 1446.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over civil actions where the amount in controversy exceeds $75,000.00 and there exists complete diversity between plaintiffs and defendants.  28 U.S.C. § 1332(a) and *Akno 1010 Mkt. St. St. Louis Mo. LLC v. Nahid Pourtaghi*, 43 F.4th 624, 626 (6th Cir. 2022).

3.      There exists complete diversity between the known parties.

4.      The amount in controversy to be determined in trial, exceeding the $75,000.00 requirement.

5.      This Court has personal jurisdiction over Defendants because Defendants systematically and continuously conduct business activities and/or enter into contractual relationships within this State.

6.      This venue is proper pursuant to 28 U.S.C. §§ 1391 and 1441(a), because this Court

2

is in the district and division embracing the place where the original state court action was removed from.

## PARTIES

7.      Plaintiff  Richardson realleges and reavers the allegations contained in paragraphs 1 through 6 of the First Amended Complaint as though fully rewritten herein.

8.      Plaintiff Richardson is an individual residing in the City of Akron and in the State of Ohio.

9.      Defendant CMFG is an Iowa corporation, with its principal place of business in Madison, Wisconsin.

10.     Defendant CMFG is authorized to provide insurance products in the State of Ohio.

11.     Defendant TruStage Insurance is a foreign limited liability company, formed in the State of Iowa, with its principal place of business in Madison, Wisconsin.

12.     Defendant TruStage Insurance is authorized to do business in the State of Ohio.

13.     Defendant TruStage Financial is an Iowa corporation, with its principal place of business in Madison, Wisconsin.

14.     Defendant TruStage Financial is authorized to do business in the State of Ohio.

15.     Defendant John Doe Corporation's name and address is currently unknown.  If and when said name and address become available, Plaintiff will amend this claim to add their true identity.

16.     Defendant John Doe Corporation is authorized to do business in the State of Ohio.

## STATEMENT OF FACTS

17.     Richardson realleges and reavers the allegations contained in paragraphs 1 through 16 of the First Amended Complaint as though fully rewritten herein.

3

18.     Prior to February 17, 2022, Johnny R. Travis (hereinafter "Travis") was a customer and/or client of John Doe Corporation for services and/or products unrelated to TruStage Insurance, TruStage Financial, and CMFG.

19.     Prior to February 17, 2022, TruStage Insurance, TruStage Financial, and/or John Doe Corporation (individually and/or collectively) provided advertisement information of CMFG's life insurance products to Travis.

20.     Prior to March 01, 2024, TruStage Insurance, TruStage Financial, and/or John Doe Corporation (individually and/or collectively) provided advertisement information of CMFG's life insurance products to Richardson.

21.     TruStage Insurance, TruStage Financial, and/or John Doe Corporation were CMFG's agent(s) when they provided advertisement information about CMFG's life insurance products to Travis and Richardson.

22.     Advertisement of CMFG products represented to Travis and Richardson that CMFG does not require Travis to submit to a health examination when purchasing life insurance products.

23.     Travis signed a waiver to Defendants when he applied for CMFG's life insurance policy, allowing Defendants to access his medical records.

24.     On or around February 17, 2022, Travis entered into a Whole Life Insurance Policy (hereinafter the "Policy") with Defendants for Defendants to provide the beneficiary, Richardson, a Fifty Thousand Dollars ($50,000.00) death benefit in the event of Travis's death.  A true and accurate copy of the Policy is attached and incorporated hereto as Exhibit "1".

25.     Prior to March 01, 2024, Richardson also purchased life insurance from Defendants on himself for the benefits of his sons.

4

26.     Richardson has paid at least One Thousand Five Hundred Dollars ($1,500.00) in premiums for the life insurance he purchased from Defendants.

27.     Travis passed away on October 24, 2023, in the County of Summit, Ohio.

28.     Per the Policy, Richardson need only submit Travis's name, date of birth, date of death, the Policy's number, and evidence of death, i.e. death certificate, in order to file a claim on the Policy. See page 15 and Section 4 of page 22 of the Policy.

29.     On or around November 2023, Richardson submitted Travis's name, date of birth, date of death, the Policy's number, and death certificate to Defendants.  A true and accurate copy of Travis's death certificate is attached and incorporated hereto as Exhibit "2".

30.     Travis's death certificate stated his cause of death.

31.     Defendants knew, or should have known, of Travis's ailments prior to entering into the Policy with Travis.

32.     On or around November 29, 2023, CMFG, through TruStage Insurance and/or TruStage Financial, mailed Richardson a letter requesting Richardson submit to Defendants a Certificate of Appointment, issued by an Ohio Probate Court, that will authorize the release of Travis's medical records.  See said letter attached and incorporated hereto as Exhibit "3".

33.     Under Ohio Revised Code 2113.032 and the rules of Summit County Court of Common Pleas, Probate Division, the release of medical records requires additional filings with the Summit County Court of Common Pleas, Probate Division.

34.     Per page 15 and 22 of the Policy, Defendants may require "additional documentation" to "determine liability[.]"

35.     Travis's death did not involve personal injury nor wrongful death. Travis died of a heart attack.

36.     CMFG knew, or should of have known, of Travis's medical condition prior to Travis's death.

37.     CMFG does not allege in Exhibit 3 that Travis provided false information on his application.

38.     CMFG's need to "determine liability" is not supported.

39.     CMFG requiring "additional documentations" is wholly unnecessary.

40.     Richardson is a third-party beneficiary to the Policy.

41.     The Policy is ambiguous as to whether Richardson is obligated to file with an Ohio Probate Court and obtain the "additional document[s]" or Certificate of Appointment, from said Court, in order to file the claim with CMFG.

42.     The Policy does not specify what specific or type of "additional documentation", stated on page 15 of the Policy, that is needed to file a claim.

43.     The Policy does not specify what specific or type of "sufficient information", stated on page 22, Section 4.02, of the Policy, that is needed to file a claim.

44.     The Policy does specifically state in Section 4, page 22, of the Policy as follows, "The death proceeds become payable to the Beneficiary on file at our administrative office when we receive Proof of Death of the insured."

45.     Richardson does not need to file with an Ohio Probate Court and obtain the "additional document[s]" or Certificate of Appointment, from said Court, in order to file the claim with CMFG.

46.     CMFG, TruStage Financial, TruStage Insurance, and/or John Doe Corporation knew, or should have known, that their policyholders, including Travis, and/or policy beneficiaries, including Richardson, does not, or may not, possess the resources to pursue CMFG on insurance claims in the event CMFG denies or delays a claim.

47.     Defendants represented to Richardson that he did not need a health examination to purchase the life insurance and that his beneficiary would only need to submit his death certificate when they file a claim.

48.     Defendants have a policy to procedure to deny beneficiary's claims on life insurance policies by subjecting the beneficiary to obligations in addition to submitting the policyholder's death certificate.

49.     Defendants had no intention to pay on Richardson's own life insurance policy without subjecting his beneficiaries to additional obligations when they are to file claims on Richardson's policy, despite those additional obligations were omitted from Defendant's advertisement materials sent to Richardson.

50.     Defendants induced Richardson to purchase a life insurance policy by omitting material information, such as the details pertaining to a beneficiary's procedure in filing a claim.

## CLASS ACTION ALLEGATIONS

51.     Pursuant to Fed. R. Civ. P. 23, Richardson brings this action on behalf of himself and on behalf of the following Class:

a.  All natural persons residing within the United States and its Territories within five (5) years prior to the filing of this Complaint and continuing through the final resolution of this case: (1) who was the policyholder or intended beneficiary (the "Class") of a life insurance policy issued by CMFG, TruStage Financial, and/or TruStage Insurance advertised as not requiring a medical history when applying for the policy; (2) the purchaser/policyholder of the life insurance policy was a member of a credit union; and (3) if the person is the purchaser/policyholder, he/she was represented and/or advertised to by CMFG, TruStage Financial, TruStage Insurance,

7

and/or John Doe Corporation regarding certain life insurance products that do not require health examinations or, if the person is the intended beneficiary, his/her claim was denied, or delayed for more than 30 days, even after the submission of a death certificate.

52.     Richardson is a member, as a life insurance policyholder and a beneficiary, of the Class.

53.     Richardson reserves the right to amend the Class definition as discovery progresses.

54.     Members of the Class are readily identifiable from the records created, maintained, and stored within Defendants' custody and control.

55.     Richardson does not know the number of members in the Class, but Richardson reasonably believes, based on the size and scope of Defendants' operations, that the Class consists of more than 40 individuals.

56.     Richardson and the Class's claims raise predominantly common factual and legal questions that a class wide proceeding can answer for all Class members, including, but not limited to:

a.  Whether Defendants have a practice or procedure to ensure that their life insurance products are advertised to lower income individuals;

b.  Whether Defendants have a practice or procedure to ensure that they represent that their life insurance products do not require individuals to submit a health examination during the underwriting process;

c.  Whether Defendants' practice or procedure to examine claims involve requiring a beneficiary to submit documents, aside from the death certificate, relating to the policyholder, the policyholder's estate, and/or the policyholder's health;

8

    d.   Whether Defendants' practice or procedure to examine claims provide any meaningful opportunity, avenues, or aid for the beneficiary to obtain additional documents, aside from the policyholder's death certificate;

    e.   Whether Defendants have a practice or procedure to ensure that beneficiary's claims are denied or delayed, even after the beneficiary submits the policyholder's death certificate;

    f.   Whether Defendants' practice or procedure to deny or delay a claim constitute a breach of the life insurance policy, in bad faith, even though Defendants had access to the policyholder's health records and did not subject the policyholder to a health examination during the underwriting process;

    g.   Whether Richardson and members of the Class suffered damage as a result of Defendants' actions, and the amount of that damage.

57.    Richardson's claims are typical of those members of the Class he seeks to represent, in that they derive from the same course of conduct by Defendants as to each individual who is, or was, a policyholder or beneficiary to a life insurance policy, of which the policyholder was of a lower income, and members of the Class were denied or delayed claims due to Defendants' process of requiring more than just the policyholder's death certificate.

58.    Defendants omitted material information, such as details regarding the procedure to file a claim, when they provided advertisement materials to the policyholder/purchaser members.

59.    Defendants imposed additional obligations, not explicitly explained in the life insurance policy, upon members of the Class in order for the beneficiary members to submit a claim.

60.    Members of the Class do not, or may not, have the resources to comply with the additional obligations Defendants imposed upon them.

61.     Richardson will fairly and adequately protect the proposed Class's interests.  His interests do not conflict with Class members' interests, and he has retained counsel experienced in complex class action litigations to prosecute this action on the Class's behalf.

62.     Common questions of law and fact, as articulated above, predominate over any individualized questions.

63.     A class action is superior to individual litigation or any other available method to fairly and efficiently adjudicate the controversy. The damages available to individual plaintiffs are insufficient to make individual lawsuits economically feasible.

64.     Defendants have acted on grounds generally applicable to the Class, thereby making the final prayer for relief with respect to the Class as a whole appropriate.

### FIRST CLAIM FOR RELIEF: Breach of Contract/Covenant for Good Faith and Fair Dealing
#### (On Behalf of Richardson)

65.     Richardson realleges and reavers the allegations contained in paragraphs 1 through 64 of the First Amended Complaint as though fully rewritten herein.

66.     Travis has complied with any and all of his obligations set forth in the Policy, including, but not limited to, paying the premiums for the Policy.

67.     Richardson has complied with any and all of his obligations set forth in the Policy, including, but not limited to, submitting Travis's name, date of birth, date of death, the Policy's number, and death certificate to Defendants.

68.     Contrary to the terms of the Policy, Defendants required Richardson to submit a Certificate of Appointment, issued by an Ohio Probate Court, that will authorize the release of Travis's medical records.

69.     Under the Policy, in order to receive the Policy's proceeds, Richardson is not obligated

10

to file with an Ohio Probate Court and obtain "additional [release of medical records] document[s]" or Certificate of Appointment, from said Probate Court, in order to obtain the death proceeds from the Policy.

70.     Defendants breached their obligations under the Policy by failing to pay the proceeds under the Policy to Richardson.

71.     As a direct and proximate result of Defendants' breaches of the Policy, Richardson suffered damages in an amount to be determined at trial and in the amount no less than One Hundred Thousand Dollars ($100,000.00).

**SECOND CLAIM FOR RELIEF: Bad Faith**
**(On Behalf of Richardson)**

72.     Richardson realleges and reavers the allegations contained in paragraphs 1 through 71 of the First Amended Complaint as though fully rewritten herein.

73.     Defendants owed a duty of good faith to settle Richardson's claims.

74.     Defendants represented to Travis that the Policy did not require a health examination.

75.     Defendants had access to Travis's medical records prior to entering into the Policy.

76.     Defendants knew, or should have known, of Travis's health conditions prior to entering into the Policy.

77.     Richardson submitted Travis's death certificate.

78.     The death certificate indicated Travis's cause of death.

79.     Defendants required additional access to Travis's medical records after his death before processing Richardson's claim.

80.     Defendants lack reasonable justification for requiring Richardson to submit

additional documents related to Travis's health and/or death.

81.     Defendants intentionally refused, or imposed unreasonable and/or unnecessary conditions, to process Richardson's claims.

82.     Defendants have no lawful or equitable bases to refuse or delay Richardson's claims.

83.     Defendants lacked reasonable justification for delaying or refusing to satisfy the claim both in law and in knowledge of facts.

84.     Defendants refused to process Richardson's claims based on ambiguous conditions in the Policy Defendants wrote.

85.     Defendants attempted to coerce Richardson into filing and going through a judicial process in order to obtain release of medical records documents that Richardson is not obligated to obtain.

86.     Travis has been a loyal and faithful customer to Defendants for many years and he and Richardson expected Defendants to honor the Policy after Travis's death.

87.     Defendants are acting in Bad Faith towards Richardson.

### THIRD CLAIM FOR RELIEF: Fraud
#### (On Behalf of Richardson)

88.     Richardson realleges and reavers the allegations contained in paragraphs 1 through 87 of the First Amended Complaint as though fully rewritten herein.

89.     Defendants made representations to Richardson that he did not need a health examination to purchase life insurance from Defendants.

90.     Defendants omitted details of the claim filing process.

91.     Defendants knew that if they had disclosed to Richardson that the beneficiary were required to submit additional health-related documents of Richardson after his death,

Richardson would not have purchased the life insurance policy.

92.     Defendants' representations and/or omitted details were material.

93.     Defendants' misrepresentation of material facts induced Richardson to purchase the life insurance policy from Defendants.

94.     Richardson was a client of John Doe Corporation, for services and products unrelated to life insurance, prior to him purchasing life insurance from Defendants.

95.     Richardson was justified in relying on Defendants' representations given Defendants' nationwide operations and his relationship with John Doe Corporation.

96.     Richardson was damaged by Defendants' fraudulent misrepresentations when he paid insurance premiums into a life insurance policy he was induced into purchasing.

97.     As a direct and proximate cause of Defendants' fraudulent misrepresentations, Richardson suffered damages in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF: Negligent Misrepresentation
**(On Behalf of Richardson)**

98.     Richardson realleges and reavers the allegations contained in paragraphs 1 through 97 of the First Amended Complaint as though fully rewritten herein.

99.     Defendants, in the course of their business, either individually or collectively, advertised to Travis about Defendants' life insurance products.

100.    Defendants had a pecuniary interest in inducing Travis into purchasing their life insurance products.

101.    Defendants represented to Travis that the Policy does not require health examinations.

102.    Defendants represented to Travis that the Policy only requires Travis to sign a

13

waiver for Defendants to access his medical records.

103.    Defendants represented to Travis that the beneficiary of the Policy need only submit Travis's death certificate in order to obtain the death proceeds.

104.    Defendants failed to disclose to Travis that the beneficiary of the Policy may be required to submit additional documentation or other information, besides Travis's death certificate, in order for the beneficiary to obtain the death proceeds.

105.    Defendants failed to disclose to Travis the specific or type of additional documentation or other information, besides Travis's death certificate, that the beneficiary of the Policy may be required to submit.

106.    The terms, "additional documentation" and "sufficient information", in the Policy are ambiguous.

107.    Defendants failed to disclose to Travis that the beneficiary of the Policy may be required to perform additional tasks, besides submitting Travis's death certificate, in order for the beneficiary to obtain the death proceeds.

108.    Defendants have operations nationwide.

109.    Travis was justified in relying on Defendants' representations, given the size of Defendants' operations.

110.    Travis reasonably relied on Defendants' representations of the Policy's application and claim-filing processes before entering into the Policy for the benefit of Richardson.

111.    Defendants knew, or should have known, that Travis reasonably relied on their representations when he decided to enter into the Policy with Defendants.

112.    Defendants failed to exercise reasonable care in communicating to Travis the possibility of additional documentation, other information, and/or other tasks, required of

14

Richardson in order to receive the death proceeds.

113.     Defendants failed to exercise reasonable care in communicating to Travis the details of additional documentation, other information, and/or other tasks, required of Richardson in order to receive the death proceeds.

114.     Richardson, as the beneficiary to the Policy, is a limited class individual for whose benefits the Defendants' representations/omissions were made and whose reliance on the representations/omissions were foreseen by Defendants.

115.     As a direct and proximate result of Defendants' negligent misrepresentation, Richardson suffered damages in an amount to be determined at trial and in the amount no less than One Hundred Thousand Dollars ($100,000.00).

<strong><u>FIFTH CLAIM FOR RELIEF: Breach of Contract/Covenant for<br>Good Faith and Fair Dealing</u></strong><br><strong>(On Behalf of the Class)</strong>

116.     Richardson and each beneficiary member of the Class realleges and reaver the allegations contained in paragraphs 1 through 115 of the First Amended Complaint as though fully rewritten herein.

117.     Policyholders of each life insurance policy, issued by Defendants, have complied with any and all of their obligations set forth in their respective life insurance policies, including, but not limited to, paying the premiums for each policy.

118.     Richardson and each beneficiary member of the Class, as beneficiaries to the life insurance policies, and have complied with any and all of their obligations set forth in the respective life insurance policies, including, but not limited to, submitting the policyholders' names, dates of birth, dates of death, the life insurance policies' numbers, and death certificates to Defendants.

119.     Contrary to the terms of the life insurance policies, Defendants required Richardson

15

and each beneficiary member of the Class to submit additional documentations relating to the policyholders' health and/or death before proceeding the claims.

120.    Defendants have a practice or procedure to ensure that their life insurance products are advertised to lower income individuals, including, but not limited to, Travis.

121.    Defendants have a practice or procedure to ensure that they represent that their life insurance products do not require individuals, including, but not limited to, Travis, to submit a health examination during the underwriting process.

122.    Contrary to the terms of their own life insurance policies, Defendants' practice or procedure to examine claims involve requiring a beneficiary, including, but not limited to, Richardson and each beneficiary member of the Class, to submit documents, aside from the death certificate, relating to the policyholder, the policyholder's estate, and/or the policyholder's health.

123.    Defendants' practice or procedure to examine claims fail to provide any meaningful opportunity, avenues, or aid for the beneficiary, including, but not limited to, Richardson and each beneficiary member of the Class, to obtain additional documents, aside from the policyholder's death certificate.

124.    Contrary to the terms of their own life insurance policies, Defendants have a practice or procedure to ensure that beneficiary's claims are denied or delayed, even after the beneficiary, including, but not limited to, Richardson and each beneficiary member of the Class, submits the policyholder's death certificate.

125.    Defendants' practice or procedure to deny or delay a claim constitute a breach of the life insurance policy, in bad faith, even though Defendants had access to the policyholders' health records and did not subject the policyholders to a health examination during the underwriting process.

16

126.     Defendants breached their obligations under life insurance policies they wrote by failing to pay the proceeds to Richardson and each beneficiary member of the Class.

127.     That as a direct and proximate result of Defendants' breaches of their life insurance policies, Richardson and each beneficiary member of the Class suffered damages in an amount to be determined at trial and in the amount no less than One Hundred Thousand Dollars ($100,000.00) each.

## SIXTH CLAIM FOR RELIEF: Bad Faith
### (On Behalf of the Class)

128.     Richardson and each beneficiary member of the Class reallege and reaver the allegations contained in paragraphs 1 through 127 of the First Amended Complaint as though fully rewritten herein.

129.     Defendants owed a duty of good faith to settle Richardson and each beneficiary member of the Class's claims.

130.     Defendants represented to Travis and other policyholders that their life insurance policies from Defendants did not require a health examination.

131.     Defendants had access to Travis's and the policyholders' medical records prior to entering into their respective life insurance policies.

132.     Defendants knew, or should have known, of Travis's and the policyholders' health conditions prior to entering into their respective life insurance policies.

133.     Richardson and each beneficiary member of the Class submitted the policyholders', including, but not limited to, Travis's, death certificates.

134.     The death certificates indicated Travis's the policyholders' causes of death.

135.     Defendants required additional documentation after the policyholders' deaths,

including Travis's, before processing Richardson's and each beneficiary member's claims.

136.    Defendants lack reasonable justification for requiring Richardson and each member of the Class to submit additional documents related to policyholders' health and/or death, including Travis's.

137.    Defendants intentionally refused, or imposed unreasonable and/or unnecessary conditions, to process Richardson's and each beneficiary member's claims.

138.    Defendants have no lawful or equitable basis.

139.     to refuse or delay Richardson's and each beneficiary member's claims.

140.    Defendants lacked reasonable justification for delaying or refusing to satisfy the claims both in law and in knowledge of facts.

141.    Defendants refused to process Richardson's and each beneficiary member's claims based on ambiguous conditions in the life insurance policies Defendants wrote.

142.    The policyholders, including Travis, have been loyal and faithful customers to Defendants for many years and they, Richardson, and each beneficiary member of the Class expected Defendants to honor the life insurance policies after the policyholders' deaths.

143.    Defendants are acting in Bad Faith towards Richardson and each beneficiary member of the Class.

## SEVENTH CLAIM FOR RELIEF: Fraud
### (On Behalf of the Class)

144.    Richardson and each policyholder member of the Class realleges and reavers the allegations contained in paragraphs 1 through 143 of the First Amended Complaint as though fully rewritten herein.

145.    Defendants made representations to Richardson and each policyholder member of

the Class that they did not need a health examination to purchase life insurance from Defendants.

146.    Defendants omitted details of the claim filing process.

147.    Defendants knew that if they had disclosed to Richardson and the policyholder members that their beneficiaries were required to submit additional health-related documents of policyholders after their death, Richardson and these members would not have purchased the life insurance policies from Defendants.

148.    Defendants' representations and/or omitted details were material.

149.    Defendants' misrepresentation of material facts induced Richardson and the policyholder members to purchase the life insurance policies from Defendants.

150.    Richardson and the policyholder members were clients of John Doe Corporation, for services and products unrelated to life insurance, prior to purchasing life insurance from Defendants.

151.    Richardson and the policyholder members were justified in relying on Defendants' representations given Defendants' nationwide operations and their relationships with John Doe Corporation.

152.    Richardson and the policyholder members were damaged by Defendants' fraudulent misrepresentations when they paid insurance premiums into a life insurance policy that they were induced into purchasing.

153.    As a direct and proximate cause of Defendants' fraudulent misrepresentations, Richardson policyholder members suffered damages in an amount to be determined at trial.

**EIGHTH CLAIM FOR RELIEF: Negligent Misrepresentation**
**(On Behalf of the Class)**

154.    Richardson and each beneficiary member of the Class reallege and reaver the

allegations contained in paragraphs 1 through 153 of the First Amended Complaint as though fully rewritten herein.

155.     Defendants, in the course of their business, either individually or collectively, advertised to Travis and other policyholders about Defendants' life insurance products.

156.     Defendants had a pecuniary interest in inducing Travis and other policy holders into purchasing their life insurance products.

157.     Defendants represented to Travis and other policyholders that their life insurance products, including, but not limited to, the Policy, do not require health examinations.

158.     Defendants represented to Travis and other policyholders that Defendants only need access their respective medical records during the underwriting process.

159.     Defendants represented to Travis and other policyholders that the beneficiaries of the life insurance policies need only submit the policyholders' death certificates in order to obtain the death proceeds.

160.     Defendants failed to disclose to Travis and other policyholders that the beneficiaries of the life insurance policies may be required to submit additional documentation or other information, besides death certificates, in order to obtain the death proceeds.

161.     Defendants failed to disclose to Travis and other policyholders the specific or type of additional documentation or other information, besides death certificates, that the beneficiaries of the life insurance policies may be required to submit.

162.     Defendants failed to disclose to Travis and other policyholders that the beneficiaries of the life insurance policies may be required to perform additional tasks, besides submitting death certificates, in order to obtain the death proceeds.

163.     Defendants have operations nationwide.

20

164. Travis and other policyholders were justified in relying on Defendants' representations, given the size of Defendants' operations.

165. Travis and other policyholders reasonably relied on Defendants' representations of the life insurance application and claim-filing processes before purchasing the policies.

166. Defendants knew, or should have known, that Travis and other policyholders reasonably relied on Defendants' representations when they purchased the life insurance policies.

167. Defendants failed to exercise reasonable care in communicating to Travis and other policyholders the possibility of additional documentation, other information, and/or other tasks, required of Richardson and each beneficiary member of the Class.

168. Defendants failed to exercise reasonable care in communicating to Travis and other policyholders the details of additional documentation, other information, and/or other tasks, required of Richardson and each beneficiary member of the Class.

169. Richardson and each beneficiary member of the Class, as the beneficiaries to Defendants' life insurance policies, constitute a limited class of individuals for whose benefits the Defendants' representations/omissions were made and whose reliance on the representations/omissions were foreseen by Defendants.

170. As a direct and proximate result of Defendants' negligent misrepresentation, Richardson and each beneficiary member of the Class suffered damages in an amount to be determined at trial and in the amount no less than One Hundred Thousand Dollars ($100,000.00) each.

## **PRAYER FOR RELIEF**

WHEREFORE, Richardson and members of the Class respectfully pray that this Court grant the following order and relief:

21

A.      Certification of this case as a class action on behalf of Richardson and the proposed

Class, appointing Richardson as class representative, and appointing his counsel to represent the

Class;

B.      Judgment entered in favor of Richardson and the Class on all counts of the First

Amended Complaint, and an award of compensatory damages in the amount to be determined at

trial and not less than One Hundred Thousand Dollars ($100,000.00), for Richardson and each

Class member, plus interest and late fees;

C.      An award of pre- and post-judgment interests and court costs of this suit as allowed

by law;

D.      Reasonable attorney's fees pursuant to Claims Two and Four for Bad Faith,

and/or as allowed by law;

E.      Punitive damages in the amount to be determined at trial and not less than Two

Hundred Thousand Dollars ($200,000.00) for Richardson and each member of the Class pursuant

to Claims Two and Six for Bad Faith and Claims Three and Seven for Fraud.

F.      Allow Richardson and the Class leave to amend this First Amended Complaint to

conform to the evidence produced at discovery and trial; and

G.      Other or further relief as may be appropriate under the circumstances.


Respectfully submitted,
**Roderick Linton Belfance, LLP**

/s/Danny Guan
_____
Thomas P. Coffee (0039103)
Lawrence R. Bach (0021205)
Danny Guan (0103020)
50 S. Main Street, 10th Floor

22

Akron, Ohio 44308-1849
Telephone No. (330) 434-3000
Facsimile No. (330) 434-9220
E-mail address: tcoffee@rlbllp.com
dguan@rlbllp.com
*Attorneys for Plaintiff*

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury based upon all issues in this matter.

/s/Danny Guan

_____

Danny Guan (0103020)
Thomas P. Coffee (0039103)

## <u>CERTIFICATE OF SERVICE</u>

A copy of the foregoing was served and filed on this 24 day of April, 2024 in accordance with the Court's electronic Filing Guidelines. Notice of this filing will be sent to all Parties by operation of the Court's Electronic Filing System and may be accessed by the Parties on said filing system.

/s/Danny Guan
_____
Danny Guan (0103020)



**TruStage Financial Group**

P.O. Box 61 • Waverly, IA 50677-0061

February 18, 2022

Prepared for JOHNNY R TRAVIS, a member of **Towpath Credit Union Inc**

JOHNNY R TRAVIS
929 MCKINLEY AVE
AKRON OH 44306-1970



**IMPORTANT**: REVIEW REQUESTED
Your TruStage Whole Life Insurance policy is enclosed.



EXHIBIT

1




## WELCOME JOHNNY

Your TruStage Whole Life policy is enclosed. Congratulations on taking this important step to help protect your family's future. You've made a great choice. Here are some of the key benefits your policy provides:

• Income-tax-free payment to your beneficiaries if you die.
• Permanent protection, even if your health changes.
• Guaranteed rate for life, as long as payments are made.

## MY POLICY SUMMARY

POLICY NUMBER… LC2455046
INSURED…............. JOHNNY R TRAVIS
BENEFICIARY…........ LAMARD RICHARDSON
POLICY AMOUNT… $50,000
POLICY STATUS.... Effective 02/17/2022
POLICY TYPE…........ TruStage Whole Life
ISSUED BY…........... CMFG Life Insurance Company

## NEXT STEPS

1. Review payment details below.
2. Review the enclosed documents and save your policy in a secure place.

## MY PAYMENT DETAILS

**First Payment:** Charged to your Visa ending in 1608
**Amount:** $1.00*
**Charge Date:** 02/17/2022
**Ongoing Payments:** You'll be charged monthly.

Payments typically process in 1-3 business days (excluding weekends and holidays) and will appear on your financial statement as a charge by TruStage CMFG.

## MANAGE MY POLICY

To get help or file a claim call: 1-888-787-8243
Service your account: TruStage.com/MyAccount

TruStage Insurance is issued by CMFG Life Insurance Company, part of TruStage Financial Group, Inc.

* Amount shown is the $1 introductory offer.

6231

TruStage® Insurance is issued by CMFG Life Insurance Company, part of TruStage Financial Group, Inc.

 

**CUNA MUTUAL GROUP** | CMFG Life Insurance Company | CUNA Brokerage Services, Inc.

**TruStage** | MEMBERS Life Insurance Company | CUMIS Insurance Society, Inc.

rev. 10/20

| FACTS | WHAT DOES CUNA MUTUAL GROUP DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>■ Social Security Number  ■ Medical information  ■ Retirement assets<br>■ Income  ■ Checking account information  ■ Investment experience<br>When you are *no longer* our customer, we continue to share your information as described in this notice. |
| **How?** | All financial companies need to share members' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their members' personal information; the reasons CUNA Mutual Group chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does CUNA Mutual Group share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes –** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or to report to credit bureaus | Yes | No |
| **For our marketing purposes –** to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | Yes |
| **For our affiliates' everyday business purposes –** information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes –** information about your creditworthiness | No | We don't share |
| **For nonaffiliates to market to you** | No | We don't share |

| To limit our sharing | ■ Call 800.834.2617 – our menu will prompt you through your choice(s),<br>■ Visit us online: https://MembersProducts.com/PrivacyChoices<br>**Please note:** If you are a *new* customer, we can begin sharing your information 30 days from the date we sent this notice. When you are *no longer* our customer, we continue to share your information as described in this notice. However, you can contact us at any time to limit our sharing. |
|---|---|
| Questions? | Call toll-free 800.834.2617 or go to www.cunamutual.com. |



CI391175

0R07_A

03648989   13395  P

897    2

861-2-1020

*(continued on next page)*

**Page 2**

## Who we are

| | |
|---|---|
| **Who is providing this notice?** | CMFG Life Insurance Company; MEMBERS Life Insurance Company; CUNA Brokerage Services, Inc.; CUMIS Insurance Society, Inc.; TruStage Insurance Agency, LLC. |

## What we do

| | |
|---|---|
| **How does CUNA Mutual Group protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. We restrict access to personal information about you to staff on a "need to know" basis. |
| **How does CUNA Mutual Group collect my personal information?** | We collect your personal information, for example, when you<br>■ Apply for insurance<br>■ Open an account<br>■ File an insurance claim<br>■ Seek advice about your investments<br>■ Make deposits or withdrawals from your account<br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br>■ sharing for affiliates' everyday business purposes – information about your creditworthiness<br>■ affiliates from using your information to market to you<br>■ sharing for nonaffiliates to market to you<br>State law and individual companies may give you additional rights to limit sharing.<br>See below for more on your rights under state law. |

## Definitions

| | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>■ *Our affiliates include financial companies such as MEMBERS Capital Advisors, Inc. and CUNA Mutual Insurance Agency, Inc.* |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>■ *CUNA Mutual Group does not share with nonaffiliates so they can market to you.* |
| **Joint Marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>■ *Our joint marketing partners include credit unions, credit union service organizations, other insurers, and other financial institutions.* |

## Other important information

**Arizona, Connecticut, Georgia, Massachusetts, Nevada, New Jersey, Ohio.** Personal information may be collected from persons other than the individual or individuals proposed for coverage. In certain circumstances this information may be disclosed to third parties without authorization. A right of access and correction exists with respect to all personal information collected. For certain products, a more complete notice of information handling is available upon request.

**California.** You have the right to control the sharing of personal and financial information with affiliated companies and with outside companies that the financial institution contracts with to provide financial products and services. To exercise your right, refer to the "Important Privacy Choices for Consumers" disclosure. Once your privacy choices have been selected they do not change unless you request the change. We may not disclose your personal information with non-affiliated third parties unless you authorize us to, or if permitted by law.

**Maine.** You have the right to obtain access to your recorded personal information in our possession or control, to request correction if you believe the information to be inaccurate, and to add a rebuttal statement to the file if there is a dispute. You have the right to know the reasons for an adverse underwriting decision. Previous adverse underwriting decisions may not be used as the basis for subsequent underwriting decisions unless we make an independent evaluation of the underlying facts. You have the right, with very narrow exceptions, not to be subjected to pretext interviews. We may not disclose your personal information with non-affiliated third parties unless you authorize us to, or if permitted by law.

**CUNA Brokerage Services, Inc. (CBSI) customers.** If you buy products from a registered representative of CBSI, your representative may leave to join or partner with another broker-dealer. They may keep some of your personal information and they may disclose it to transfer your account or process your business. We may disclose your personal information to transfer your account in accordance with applicable laws. If you do not want us to disclose your nonpublic information with your representative's new financial institution, please contact us at the CBSI Customer Service Department at 1.800.369.2862.

1861-2-1020

## CMFG LIFE INSURANCE COMPANY
## STATEMENT OF POLICY COST AND BENEFIT INFORMATION

| PREPARED FOR: | JOHNNY R TRAVIS | | |
|---|---|---|---|
| SEX: | Male | DATE PREPARED: | February 18, 2022 |
| ISSUE AGE: | 67 | POLICY NUMBER: | LC2455046 |

Your plan of insurance consists of the following:

| Plan Name: | Simplified Issue Whole Life (SIWL) |
|---|---|
| Plan Description: | A whole life policy with level premiums and level death benefit and matures at age 121. |

| POLICY YEAR | BEGINNING OF YEAR GUARANTEED ANNUAL PREMIUM | BEGINNING OF YEAR GUARANTEED DEATH BENEFIT | END OF YEAR GUARANTEED CASH SURRENDER VALUE |
|---|---|---|---|
| 1 | $3,642.00 | $50,000.00 | $0.00 |
| 2 | $3,642.00 | $50,000.00 | $445.50 |
| 3 | $3,642.00 | $50,000.00 | $2,196.00 |
| 4 | $3,642.00 | $50,000.00 | $3,957.00 |
| 5 | $3,642.00 | $50,000.00 | $5,722.00 |
| 6 | $3,642.00 | $50,000.00 | $7,483.00 |
| 7 | $3,642.00 | $50,000.00 | $9,235.00 |
| 8 | $3,642.00 | $50,000.00 | $10,974.50 |
| 9 | $3,642.00 | $50,000.00 | $12,701.50 |
| 10 | $3,642.00 | $50,000.00 | $14,417.50 |
| 11 | $3,642.00 | $50,000.00 | $16,124.00 |
| 12 | $3,642.00 | $50,000.00 | $17,819.00 |
| 13 | $3,642.00 | $50,000.00 | $19,499.50 |
| 14 | $3,642.00 | $50,000.00 | $21,159.00 |
| 15 | $3,642.00 | $50,000.00 | $22,794.50 |
| 16 | $3,642.00 | $50,000.00 | $24,395.00 |
| 17 | $3,642.00 | $50,000.00 | $25,944.50 |
| 18 | $3,642.00 | $50,000.00 | $27,432.50 |
| 19 | $3,642.00 | $50,000.00 | $28,847.00 |
| 20 | $3,642.00 | $50,000.00 | $30,175.50 |
| Age 70* | $3,642.00 | $50,000.00 | $2,196.00 |
| Age 75* | $3,642.00 | $50,000.00 | $10,974.50 |
| Age 121* | $3,642.00 | $50,000.00 | $50,000.00 |

| Cost Comparison Indexes | 10 Years | 20 Years |
|---|---|---|
| Net Payment Index | $72.84 | $72.84 |
| Surrender Cost Index | $51.01 | $55.46 |

The comparison indexes are one way to compare the relative costs of two or more similar policies over a 10-year or 20-year period, assuming you do not surrender the policy. In general, a policy with a smaller index number is a better buy than a similar policy with larger index numbers.

Loans are allowed as described in the policy. The policy loan effective annual interest rate is a fixed rate applied in arrears. The rate is determined at the time of the loan and will never be greater than 8%. The rate on new loans is currently 8%.



* Age is defined as the individual's age at the end of the policy year.

N/A = Coverage is not active or has terminated per the terms of the insurance contract.

CT/391175

0407_A

13396 P

03648989

3

897

This information does not recognize that, because of interest, a dollar in the future has less value than a dollar today.

This data is for demonstration purposes only. If it is different from the policy, the terms of the policy will prevail.

If you have any questions concerning this policy summary, write us at:
CMFG Life Insurance Company
2000 Heritage Way
Waverly IA  50677

---

**NOTICE CONCERNING COVERAGE
LIMITATIONS AND EXCLUSIONS UNDER THE OHIO LIFE
AND HEALTH INSURANCE GUARANTY ASSOCIATION
ACT**

---

Residents of Ohio who purchase life insurance, annuities or health insurance should know that the insurance companies licensed in this state to write these types of insurance are members of the Ohio Life and Health Insurance Guaranty Association. The purpose of this association is to assure that policyholders will be protected, within limits, in the unlikely event that a member insurer becomes financially unable to meet its obligations. If this should happen, the guaranty association will assess its other member insurance companies for the money to pay the claims of insured persons who live in this state and, in some cases, to keep coverage in force. The valuable extra protection provided by these insurers through the guaranty association is not unlimited, however. And, as noted in the box below, this protection is not a substitute for consumers' care in selecting companies that are well-managed and financially stable.

---

The Ohio Life and Health Insurance Guaranty Association may not provide coverage for this policy. If coverage is provided, it may be subject to substantial limitations or exclusions, and require continued residency in Ohio. You should not rely on coverage by the Ohio Life and Health Insurance Guaranty Association in selecting an insurance company or in selecting an insurance policy.

Coverage is *NOT* provided for your policy or any portion of it that is not guaranteed by the insurer or for which you have assumed the risk, such as a variable contract sold by prospectus. You should check with your insurance company representative to determine if you are only covered in part or not covered at all.

Insurance companies or their agents are required by law to give or send you this notice. *However, insurance companies and their agents are prohibited by law from using the existence of the guaranty association to induce you to purchase any kind of insurance policy.*

Ohio Life and Health Insurance Guaranty Association
5005 Horizons Drive, Suite 200
Columbus, Ohio 43220

Ohio Department of Insurance
50 West Town Street
Third Floor, Suite 300
Columbus, Ohio 43215

---

The state law that provides for this safety-net coverage is called the Ohio Life and Health Insurance Guaranty Association Act. On the back of this page is a brief summary of this law's coverages, exclusions and limits. This summary does not cover all provisions of the law nor does it in any way change anyone's rights or obligations under the act or the rights or obligations of the guaranty association.



(please turn to back of page)

## COVERAGE

Generally, individuals will be protected by the life and health insurance guaranty association if they live in Ohio and hold a life or health insurance contract, annuity contract, unallocated annuity contract; if they are insured under a group insurance contract, issued by a member insurer; or if they are the payee or beneficiary of a structured settlement annuity contract. The beneficiaries, payees or assignees of insured persons are protected as well, even if they live in another state.

## EXCLUSIONS FROM COVERAGE

However, persons holding such policies are **not** protected by this association if:

- they are eligible for protection under the laws of another state (this may occur when the insolvent insurer was incorporated in another state whose guaranty association protects insureds who live outside that state);

- the insurer was not authorized to do business in this state;

- their policy was issued by a medical, health or dental care corporation, an HMO, a fraternal benefit society, a mutual protective association or similar plan in which the policyholder is subject to future assessments, or by an insurance exchange.

The association also does **not** provide coverage for:

- any policy or portion of a policy which is not guaranteed by the insurer or for which the individual has assumed the risk, such as a variable contract sold by prospectus;

- any policy of reinsurance (unless an assumption certificate was issued);

- interest rate yields that exceed an average rate;

- dividends;

- credits given in connection with the administration of a policy by a group contract holder;

- employers' plans to the extent they are self-funded (that is, not insured by an insurance company, even if an insurance company administers them).

## LIMITS ON AMOUNTS OF COVERAGE

The act also limits the amount the association is obligated to pay out: The association cannot pay more than what the insurance company would owe under a policy or contract. Also, for any one insured life, the association will pay a maximum of $300,000, except as specified below, no matter how many policies and contracts there were with the same company, even if they provided different types of coverages. The association will not pay more than $100,000 in net cash surrender, $500,000 in major medical insurance benefits, $300,000 in disability or long term care insurance benefits, $100,000 in other health insurance benefits, $250,000 in present value of annuity, or $300,000 in life insurance death benefits. Again, no matter how many different policies and contracts there were with the same company, and no matter how many different types of coverages, the association will pay a maximum of $300,000, except for coverage involving major medical insurance benefits, for which the maximum of all coverage is $500,000.

*Note to benefit plan trustees or other holders of unallocated annuities (GICs, DACs, etc.) covered by the act:* For unallocated annuities that fund governmental retirement plans under §§401, 403(b) or 457 of the Internal Revenue Code, the limit is $250,000 in present value of annuity benefits including net cash surrender and net cash withdrawal per participating individual. In no event shall the association be liable to spend more than $300,000 in the aggregate per individual, except as noted above. For covered unallocated annuities that fund other plans, a special limit of $1,000,000 applies to each contract holder, regardless of the number of contracts held with the same company or number of persons covered. In all cases, of course, the contract limits also apply.

**For more information about the Ohio Life & Health Insurance Guaranty Association, visit our website at: www.olhiga.org**
*As of 11/15/2018*

Form 1456OH 1118

**CUNA MUTUAL GROUP**

*CMFG Life Insurance Company*

2000 Heritage Way
Waverly, IA 50677

# LIFE INSURANCE
# BUYER'S GUIDE

This guide can help you when you shop for life insurance. It discusses how to:

- Find a Policy That Meets Your Needs and Fits Your Budget
- Decide How Much Insurance You Need
- Make Informed Decisions When You Buy a Policy

*Prepared by the National Association of Insurance Commissioners*

The National Association of Insurance Commissioners is an association of state insurance regulatory officials. This association helps the various insurance departments to coordinate insurance laws for the benefit of all consumers.

This guide does not endorse any company or policy.

Reprinted by
**CMFG Life Insurance Company**

## *Important Things to Consider*

1. Review your own insurance needs and circumstances. Choose the kind of policy that has benefits that most closely fit your needs. Ask an agent or company to help you.
2. Be sure that you can handle premium payments. Can you afford the initial premium? If the premium increases later and you still need insurance, can you still afford it?
3. Don't sign an insurance application until you review it carefully to be sure all the answers are complete and accurate.
4. Don't buy life insurance unless you intend to stick with your plan. It may be very costly if you quit during the early years of the policy.
5. Don't drop one policy and buy another without a thorough study of the new policy and the one you have now. Replacing your insurance may **be costly.**
6. Read your policy carefully. Ask your agent or company about anything that is not clear to you.
7. Review your life insurance program with your agent or company every few years to keep up with changes in your income and your needs.

## *Buying Life Insurance*

When you buy life insurance, you want coverage that fits your needs.

**First**, decide how much you need – and for how long – and what you can afford to pay. Keep in mind the major reason you buy life insurance is to cover the financial effects of unexpected or untimely death. Life insurance can also be one of many ways you plan for the future.

**Next**, learn what kinds of policies will meet your needs and pick the one that best suits you.

**Then**, choose the combination of policy premium and benefits that emphasizes protection in case of early death, or benefits in case of long life, or a combination of both.

It makes good sense to ask a life insurance agent or company to help you. An agent can help you review your insurance needs and give you information about the available policies. If one kind of policy doesn't seem to fit your needs, ask about others.

This guide provides only basic information. You can get more facts from a life insurance agent or company or from your public library.

## What About the Policy You Have Now?

If you are thinking about dropping a life insurance policy, here are some things you should consider:

If you decide to replace your policy, don't cancel your old policy until you have received the new one. You then have a minimum period to review your new policy and decide if it is what you wanted.

It may be costly to replace a policy. Much of what you paid in the early years of the policy you have now, paid for the company's cost of selling and issuing the policy. You may pay this type of cost again if you buy a new policy.

☐ Ask your tax advisor if dropping your policy could affect your income taxes.

If you are older or your health has changed, premiums for the new policy will often be higher. You will not be able to buy a new policy if you are not insurable.

You may have valuable rights and benefits in the policy you now have that are not in the new one.

If the policy you have now no longer meets your needs, you may not have to replace it. You might be able to change your policy or add to it to get the coverage or benefits you now want.

At least in the beginning, a policy may pay no benefits for some causes of death covered in the policy you have now.

In all cases, if you are thinking of buying a new policy, check with the agent or company that issued you the one you have now. When you bought your old policy, you may have seen an illustration of the benefits of your policy. Before replacing your policy, ask your agent or company for an updated illustration. Check to see how the policy has performed and what you might expect in the future, based on the amounts the company is paying now.

## How Much Do You Need?

Here are some questions to ask yourself:

How much of the family income do I provide? If I were to die early, how would my survivors, especially my children, get by? Does anyone else depend on me financially, such as a parent, grandparent, brother or sister?

Do I have children for whom I'd like to set aside money to finish their education in the event of my death?

How will my family pay final expenses and repay debts after my death?

Do I have family members or organizations to whom I would like to leave money?

Will there be estate taxes to pay after my death?

How will inflation affect future needs?

As you figure out what you have to meet these needs, count the life insurance you have now, including any group insurance where you work or veteran's insurance. Don't forget Social Security and pension plan survivor's benefits. Add other assets you have: savings, investments, real estate and personal property. Which assets would your family sell or cash in to pay expenses after your death?

## What Is the Right Kind of Life Insurance?

All policies are not the same. Some give coverage for your lifetime and others cover you for a specific number of years. Some build up cash values and others do not. Some policies combine different kinds of insurance, and others let you change from one kind of insurance to another. Some policies may offer other benefits while you are still living. Your choice should be based on your needs and what you can afford.

There are two basic types of life insurance: **term insurance** and **cash value insurance**. Term insurance generally has lower premiums in the early years, but does not build up cash values that you can use in the future. You may combine cash value life insurance with term insurance for the period of your greatest need for life insurance to replace income.

**Term Insurance** covers you for a term of one or more years. It pays a death benefit only if you die in that term. Term insurance generally offers the largest insurance protection for your premium dollar. It generally does not build up cash value.

You can renew most term insurance policies for one or more terms even if your health has changed. Each time you renew the policy for a new term, premiums may be higher. Ask what the premiums will be if you continue to renew the policy. Also ask if you will lose the right to renew the policy at some age. For a higher premium, some companies will give you the right to keep the policy in force for a guaranteed period at the same price each year. At the end of that time, you may need to pass a physical examination to continue coverage, and premiums may increase.

You may be able to trade many term insurance policies for a cash value policy during a conversion period - even if you are not in good health. Premiums for the new policy will be higher than you have been paying for the term insurance.

**Cash Value Life Insurance** is a type of insurance where the premiums charged are higher at the beginning than they would be for the same amount of term insurance. The part of the premium that is not used for the cost of insurance is invested by the company and builds up a cash value that may be used in a variety of ways. You may borrow against a policy's cash value by taking a policy loan. If you don't pay back the loan and the interest on it, the amount you owe will be subtracted from the benefits when you die, or from the cash value if you stop paying premiums and take out the remaining cash value. You can also use your cash value to keep insurance protection for a limited time or to buy a reduced amount without having to pay more premiums. You also can use the cash value to increase your income in retirement or to help pay for needs, such as a child's tuition, without canceling the policy. However, to build up this cash value, you must pay higher premiums in the earlier years of the policy. Cash value life insurance may be one of several types; whole life, universal life and variable life are all types of cash value insurance.

**Whole Life Insurance** covers you for as long as you live if your premiums are paid. You generally pay the same amount in premiums for as long as you live. When you first take out the policy, premiums can be several times higher than you would pay initially for the same amount of term insurance. But they are smaller than the premiums you would eventually pay if you were to keep renewing a term policy until your later years.

Some whole life policies let you pay premiums for a shorter period such as 20 years, or until age 65. Premiums for these policies are higher since the premium payments are made during a shorter period.

**Universal Life Insurance** is a kind of flexible policy that lets you vary your premium payments. You can also adjust the face amount of your coverage. Increases may require proof that you qualify for the new death benefit. The premiums you pay (less expense charges) go into a policy account that earns interest. Charges are deducted from the account. If your yearly premium payment plus the interest your account earns is less than the charges, your account value will become lower. If it keeps dropping, eventually your coverage will end. To prevent that, you may need to start making premium payments, or increase your premium payments, or lower your death benefits. Even if there is enough in your account to pay the premiums, continuing to pay premiums yourself means that you build up more cash value.

**Variable Life Insurance** is a kind of insurance where the death benefits and cash values depend on the investment performance of one or more separate accounts, which may be invested in mutual funds or other investments allowed under the policy. Be sure to get the prospectus from the company when buying this kind of policy and STUDY IT CAREFULLY. You will have higher death benefits and cash value if the underlying investments do well. Your benefits and cash value will be lower or may disappear if the investments you chose didn't do as well as you expected. You may pay an extra period for a guaranteed death benefit.

## Life Insurance Illustrations

You may be thinking of buying a policy where cash values, death benefits, dividends or premiums may vary based on events or situations the company does not guarantee (such as interest rates). If so, you may get an illustration from the agent or company that helps explain how the policy works. The illustration will show how the benefits that are not guaranteed will change as interest rates and other factors change. The illustration will show you what the company guarantees. It will also show you what *could* happen in the future. Remember that nobody knows what will happen in the future. You should be ready to adjust your financial plans if the cash value doesn't increase as quickly as shown in the illustration. You will be asked to sign a statement that says you understand that some of the numbers in the illustration are not guaranteed.

## Finding a Good Value in Life Insurance

After you have decided which kind of life insurance is best for you, compare similar policies from different companies to find which one is likely to give you the best value for your money. A simple comparison of the premiums is not enough. There are other things to consider. For example:

- Do premiums or benefits vary from year to year?
- How much do the benefits build up in the policy?
- What part of the premiums or benefits is not guaranteed?
- What is the effect of interest on money paid and received at different times on the policy?

Remember that no one company offers the lowest cost at **all** ages for **all** kinds and amounts of insurance. You should also consider other factors:

How quickly does the cash value grow? Some policies have low cash values in the early years that build quickly later on. Other policies have a more level cash value build-up. A year-by-year display of values and benefits can be very helpful. (The agent or company will give you a policy summary or an illustration that will show benefits and premiums for selected years.)

Are there special policy features that particularly suit your needs?

How are nonguaranteed values calculated? For example, interest rates are important in determining policy returns. In some companies increases reflect the average interest earnings on all of that company's policies regardless of when issued. In others, the return for policies issued in a recent year, or a group of years, reflects the interest earnings on that group of policies; in this case, amounts paid are likely to change more rapidly when interest rates change.

## Important Notice

Your policy may become a Modified Endowment Contract (MEC) for federal income tax purposes if your premiums exceed limitations.  Please read this notification for an explanation of the MEC classification.

It is important to note that MEC classification does not change the benefits under your policy or the tax treatment of proceeds in the event of your death. However, if you are considering any of the distributions noted below, you may want to discuss the tax implications with your personal tax advisor first.

### Potential Tax Implications Resulting from Modified Endowment Contract (MEC) Classification
This document explains how a life insurance contract becomes classified as a modified endowment contract and the possible income tax implications of that classification.

### What is a Modified Endowment Contract (MEC)?
In, 1988 congress enacted the Technical Miscellaneous Revenue Act (TAMRA) to discourage purchases of life insurance contracts primarily as a tax-sheltered investment.  TAMRA sets limits on how much money a contract owner can put into a life insurance contract and still receive favorable income tax treatment.  When premiums paid into a life insurance contract exceed these limits, it is classified as a MEC.

Although TAMRA generally affects contracts issued after June 20, 1988, it can also affect policies issued before this date because certain contract changes can cause the contract to become subject to the provisions of TAMRA.

### What Are the Tax Implications of Having a Contract Classified as a MEC?
There is no impact on the death benefits.  Your contract will continue to provide income tax-free death benefits.  However, distributions from a MEC are taxed to the extent that the contract values or cash surrender value exceed the premiums paid (the "investment") in the contract (the "gain").  A 10% federal penalty tax may also apply to the taxable portion of distributions paid before a contract owner reaches age 59 ½.  Gain in the contract must be distributed first from a MEC, whereas the investment in the contract is distributed first from a life insurance contract that is not classified as a MEC.

Distributions include, but are not limited to:
- Surrender of the contract or a partial withdrawal of funds;
- A loan on the contract, including a loan to pay premiums or loan interest;
- Dividends received in cash;
- Dividends used for anything other than paying premiums or purchasing additional insurance;
- Collateral assignment of the contract

Distributions made within two years of the contract becoming a MEC and previously considered tax-free may be included in gross income in the year the contract becomes a MEC.

We are providing this information based on our understanding of current tax law.  Because each situation is unique, neither we nor our representatives can offer tax advice.  You may wish to consult with your tax advisor regarding this notice.

**TruStage®**

TruStage Financial Group

# TruStage
# Insurance Policy

Issued by CMFG Life Insurance Company

**Please review your policy and save it in a secure place.**

## FILING A CLAIM

By phone: 1-888-787-8243
By email:  TruStageClaims@cunamutual.com
By mail:   TruStage Insurance
           CMFG Life Insurance Company
           PO Box 61
           Waverly, IA  50677-0061

When filing your claim, please provide the following information:

- insured's name
- insured's date of birth
- insured's date of death, or accidental injury
- policy number(s), and
- evidence of death (a death certificate or in most cases, an online obituary), or accidental injury.

If you're not the beneficiary, you may be asked for the beneficiary's contact information.

Please note: Policies in force for two years or less will require additional documentation for claim review.

6217

CI391175

OP07_A

03648989  13401  P

897       8

## We're here when you need us.

**Get help:**
1-888-787-8243

**Get more coverage:**
1-844-500-0969

**Manage your account:**
TruStage.com

**CUNA MUTUAL** GROUP

*CMFG Life Insurance Company*

P.O. Box 61 • 2000 Heritage Way
Waverly, IA 50677-0061
Phone: 800.779.5433

## WHOLE LIFE INSURANCE POLICY

### POLICY NUMBER: LC2455046

**THIS IS A LEGAL CONTRACT.** We promise to pay the proceeds and to provide the benefits described in this policy if all its terms and conditions are met. This policy is issued to the Owner based on your application and in exchange for timely payment of premiums.

**PLEASE READ YOUR POLICY CAREFULLY.**

### TABLE OF CONTENTS

Right to Examine Policy.................................................................................................. Cover Page
Policy Data Page
Definitions ......................................................................................................................Section 1
Premiums ......................................................................................................................Section 2
Coverage Provided.........................................................................................................Section 3
Payment of Proceeds ....................................................................................................Section 4
Beneficiary......................................................................................................................Section 5
Owner.............................................................................................................................Section 6
Loans..............................................................................................................................Section 7
Cash Value and Policy Surrender...................................................................................Section 8
General Provisions..........................................................................................................Section 9
Nonforfeiture Provisions...............................................................................................Section 10
Settlement Options.......................................................................................................Section 11
Endorsement(s), if any

**YOUR RIGHT TO EXAMINE THIS POLICY:** If for any reason you decide not to keep this policy, you have 30 days (or the number of days required by applicable law in the state where the policy is delivered, if more than 30) to return it or notify us that you do not want to keep it. You may return it or notify us or the agent who sold it to you. This 30-day period will begin on the date you received the policy, or the date we receive the initial premium, if later. We will refund any premiums paid, including any fees or charges. The policy will be void from the start and will be treated as if it had not been issued.

Signed for CMFG Life Insurance Company on the effective date.

*(signature)* **President**          *(signature)* **Secretary**

### INDIVIDUAL WHOLE LIFE INSURANCE POLICY
Death Proceeds Payable at the Insured's Death or Policy Maturity
Policy Matures at Age 121 Policy Anniversary
This Policy is Non-Participating – Does Not Pay Dividends

ICC17-SIWLLB

CT091175

OR97_A

03648989  13402 P    9

897

**POLICY DATA PAGE**        **POLICY NUMBER:** LC2455046

| | |
|---|---|
| **INSURED:** | JOHNNY R TRAVIS |
| **ISSUE AGE:** | 67 |
| **GENDER:** | Male |
| **EFFECTIVE DATE:** | 2/17/2022 |
| **FACE AMOUNT:** | $50,000 |
| **OWNER(S):** | JOHNNY R TRAVIS |

| Policy | Amount of Insurance | Premium Payable | Premium Class |
|---|---|---|---|
| Whole Life Policy | $50,000 | To Age 121 Policy | Standard |

| Initial Premium | Monthly Automatic Payment | Monthly Direct Bill Payment | Quarterly Automatic or Direct Bill Payment | Semi-Annual Automatic or Direct Bill Payment | Annual Automatic or Direct Bill Payment |
|---|---|---|---|---|---|
| Whole Life Policy | $303.50 | $303.50 | $910.50 | $1,821.00 | $3,642.00 |
| TOTAL PREMIUM: | $303.50 | $303.50 | $910.50 | $1,821.00 | $3,642.00 |

The policy premiums shown above include an annual policy fee of $36.00.

**Guaranteed Rate of Interest to Calculate Guaranteed Policy Values:** 3.75%

**Jurisdiction of Issue:** OH      **Department Telephone Number:** 614.644.2658

ICC17-SIWLLB

**POLICY DATA PAGE continued**

The values shown in the table below are the guaranteed values provided by the policy. These values reflect the nonforfeiture options of this policy described in Section 10. Values are based on the length of time your policy has been in force and the Insured's Age at issue. The values shown assume the premium has been paid in full for each Policy Year and there is no Indebtedness. Any Indebtedness will result in a reduction of your values. We will allow for partial years in determining values.

Values for Policy Years not shown in the table will be furnished upon request.

## TABLE OF GUARANTEED POLICY VALUES

| End of Year | Cash Value or Loan Value | Reduced Paid-Up Insurance | Extended Term Period | |
|---|---|---|---|---|
| | | | Years | Days |
| 1 | $0.00 | $0.00 | 0 | 0 |
| 2 | $445.50 | $762.52 | 0 | 203 |
| 3 | $2,196.00 | $3,664.23 | 2 | 136 |
| 4 | $3,957.00 | $6,439.78 | 3 | 253 |
| 5 | $5,722.00 | $9,087.63 | 4 | 248 |
| 6 | $7,483.00 | $11,605.16 | 5 | 161 |
| 7 | $9,235.00 | $13,995.10 | 6 | 11 |
| 8 | $10,974.50 | $16,262.33 | 6 | 173 |
| 9 | $12,701.50 | $18,415.94 | 6 | 291 |
| 10 | $14,417.50 | $20,465.87 | 7 | 4 |
| 11 | $16,124.00 | $22,421.03 | 7 | 47 |
| 12 | $17,819.00 | $24,285.42 | 7 | 62 |
| 13 | $19,499.50 | $26,062.22 | 7 | 52 |
| 14 | $21,159.00 | $27,750.67 | 7 | 23 |
| 15 | $22,794.50 | $29,353.93 | 6 | 344 |
| 16 | $24,395.00 | $30,867.64 | 6 | 291 |
| 17 | $25,944.50 | $32,283.68 | 6 | 230 |
| 18 | $27,432.50 | $33,599.97 | 6 | 165 |
| 19 | $28,847.00 | $34,813.58 | 6 | 94 |
| 20 | $30,175.50 | $35,921.28 | 6 | 21 |
| Age 95 | $37,490.00 | $41,518.12 | 4 | 273 |
| Age 121 | $50,000.00 | N/A | N/A | N/A |

**Basis for Calculating Guaranteed Policy Values**: The guaranteed policy values and net single premium rates for reduced paid-up insurance and extended term insurance are calculated using the 2017 Commissioners' Standard Ordinary, Gender Distinct, Composite, Ultimate Age Last Birthday Mortality Tables, using semi-continuous actuarial functions with interest at 3.75% . Computations assume the premium payment is annual and the death proceeds are payable at the moment of death. The guaranteed values for this policy are not less than those required by the NAIC Standard Nonforfeiture Law for Life Insurance, model #808.

| SECTION 1. | DEFINITIONS |
|---|---|

**1.01 What are the most commonly used terms and what do they mean?**

**Age.** The Insured's age at issue is his or her age as of their last birthday. An Insured's Age under the policy will be increased by one year on each Policy Anniversary thereafter.

**Authorized Request.** A request sent by the Owner to us. An Authorized Request must be in a form satisfactory to us and must be received at our administrative office. We may consent to receiving requests electronically or by telephone.

**Beneficiary, Beneficiaries.** The person(s) (or entities) who will receive the death proceeds due to the Insured's death.

**Company.** CMFG Life Insurance Company. Also referred to as "we", "our" and "us".

**Face Amount.** The amount of insurance coverage stated on the Policy Data Page.

**Indebtedness.** The amount of your loan(s) plus accrued interest on the loan(s).

**Insured.** The person whose life this policy insures. The Insured is shown on the Policy Data Page.

**Irrevocable Beneficiary.** A Beneficiary who has certain rights that cannot be changed unless he or she consents to the change.

**Legal Partner.** The person with whom you have entered into a legally-sanctioned domestic partnership or civil union that grants you the same rights, responsibilities, and obligations as opposite-sex married couples in accordance with applicable state laws.

**Maturity Date.** The Policy Anniversary on or immediately following the Insured's 121st birthday.

**Modal Period.** A period of time that is based on the premium payment frequency elected by you. You may elect to pay your premium every month, every three months (quarterly), every six months (semi-annually) or every 12 months (annually).

**Net Cash Value.** Your cash value less any Indebtedness.

**Owner.** The person(s) (or entity) who owns this policy. The Owner is shown on the application, unless later changed as allowed by this policy. If no Owner is named, then the Insured is the Owner. The Owner is also referred to as "you", "your" or "yours".

**Policy Anniversary.** The same day and month as the effective date for each succeeding year your policy remains in force.

**Policy Year.** The 12-month period ending on any Policy Anniversary.

**Premium Class.** The classification which, along with the insured's age and gender, will determine the premium that is charged. The insured's premium class is shown on the Policy Data Page.

**Proof of Death.** Proof of Death satisfactory to us. Such proof will consist of a certified copy of the death certificate of the Insured, or other lawful evidence providing equivalent information and proof of the claimant's interest in the proceeds.

| SECTION 2. | PREMIUMS |
|---|---|

**2.01 What are the premiums for your coverage?** Your premium is shown on your Policy Data Page. Premiums are payable during the Insured's lifetime until the Policy Anniversary that coincides with the Insured's age 121 under the policy. Premiums may be impacted by the method of payment you elect.

**2.02 When are premiums due and where are premiums paid?** All premiums must be paid during the Insured's lifetime and received by us on or before the date they are due. The initial premium is due on the effective date of insurance. Successive premiums are due on the first day of each successive Modal Period. Premiums must be paid to us at our designated office.

ICC17-SIWLLB

**2.03** **Can the premium be paid after the date it is due?** You have 31 days beyond the due date to pay your premium. This is called the grace period. Your policy will continue in force during the grace period. Any payments sent by mail must be postmarked on or before the end of the grace period. If the Insured dies during this period, we will deduct the premium for this 31-day grace period from the death proceeds. This 31-day grace period does not apply to the initial premium payment.

**2.04** **What happens if a premium is not paid before the end of the grace period?**
If a premium is not paid before the end of the 31-day grace period, one of the following will occur:

a.) If your policy has no cash value, your coverage will terminate;
b.) If your policy has cash value and the automatic premium loan option is in effect, an automatic premium loan will occur as described in Section 7.03; or
c.) If your policy has cash value and the automatic premium loan option is not in effect, one of the nonforfeiture options will apply, as described in Section 10.

**2.05** **Can your policy be reinstated?** If your policy lapses or is in force under a nonforfeiture option, you may ask us to reinstate your policy within three years of the last premium due date. In order to do so, we will require the following:

a.) Your Authorized Request for reinstatement during the Insured's lifetime;
b.) Evidence of insurability which is satisfactory to us;
c.) Payment of all past due premiums plus interest, at a rate not to exceed 6% per year; and
d.) Payment or reinstatement of any Indebtedness which existed prior to reinstatement.

---

| SECTION 3. | COVERAGE PROVIDED |
|---|---|

**3.01** **What is the coverage provided by this policy?** This policy provides whole life insurance for persons who become insured. Death proceeds are payable to your Beneficiary if the Insured dies while covered under this policy. If the Insured is living at the Maturity Date, the maturity proceeds will be paid to you. Your policy may also be surrendered for its Net Cash Value as described in Section 8.02 at any time prior to the Maturity Date.

**3.02** **When will insurance coverage begin?** The coverage provided by this policy takes effect only after the following:

a.) We receive and approve your written application; and
b.) We have received the initial premium.

Coverage on the Insured then takes effect on the effective date shown on the Policy Data Page.

If we do not receive an initial premium with the application, there is no insurance in effect until we receive your initial premium. Your initial premium must be received on or before the premium due date. If this initial premium is not paid on or before the premium due date, your policy will be deemed void and your application for insurance will be withdrawn. Any premium received after the premium due date will be refunded to you.

**3.03** **Can the Face Amount be increased or decreased?** The Face Amount cannot be increased after the policy effective date. The Face Amount may be decreased after the effective date by Authorized Request, subject to the following:

a.) The Face Amount, after the decrease, cannot be less than the minimum amount required to issue this policy;
b.) The cash value of the policy will be reduced in proportion to the decrease in the Face Amount; and
c.) Any Indebtedness will be repaid at the time of the decrease, to the extent possible, using the policy's cash value that is attributable to the decrease in the Face Amount. Any Indebtedness that is not repaid (because such cash value is insufficient to repay the entire amount) will be continued in the policy.



CT091175

OF07_A

03648989 13404 P

11

897

The cash value that is attributable to the decrease in the Face Amount, minus the amount required to repay any Indebtedness, will be paid to you. We reserve the right to suspend or discontinue the option to decrease the Face Amount at any time. Suspension or discontinuance of this right will be administered in a non-discriminatory manner.

**3.04    When will insurance coverage end?** The coverage provided by this policy will end automatically on the earliest of:

- a.) The date of the Insured's death;
- b.) The date we receive your Authorized Request to terminate or surrender your policy;
- c.) The date the grace period ends without a premium payment and the policy has no cash value;
- d.) The date your Indebtedness equals or exceeds the cash value of the policy, as described in Section 7.01;
- e.) The date the nonforfeiture option ends, if your coverage is in force as extended term insurance; or
- f.) The Maturity Date.

---

| SECTION 4. | PAYMENT OF PROCEEDS |
|---|---|

---

**4.01    When do death proceeds become payable?** The death proceeds become payable to the Beneficiary on file at our administrative office when we receive Proof of Death of the Insured.

**4.02    What amount is payable as death proceeds?** The amount of death proceeds payable to your Beneficiary will be determined as of the date of the Insured's death.

The death proceeds will be equal to:

- a.) The Face Amount;
- b.) Plus any portion of any premium paid beyond the Insured's date of death;
- c.) Minus any portion of any premium due as of the Insured's date of death;
- d.) Minus any Indebtedness.

We will pay interest on death proceeds from the date of the Insured's death until the date of payment, regardless if the death proceeds are based on the Face Amount or premiums paid. Interest will be paid at an annual rate equal to the current interest rate in effect on the date of death for proceeds left on deposit with us, or if we have not established a rate for funds left on deposit, at the Two Year Treasury Constant Maturity Rate as published by the Federal Reserve. In determining the effective annual rate or rates, we will use the rate in effect on the date of death.

Payment will be made within 31 calendar days of the latest of the following:

- a.) The date we receive Proof of Death;
- b.) The date we receive sufficient information to determine liability, the extent of the liability, and the appropriate payee legally entitled to the proceeds; or
- c.) The date that any legal impediments to payment of proceeds that depend on the action of parties other than us are resolved and sufficient evidence of the same is provided to us. Legal impediments to payment include, but are not limited to: 1.) The establishment of guardianships and conservatorships; 2.) The appointment and qualification of trustees, executors and administrators; and 3.) The submission of information required to satisfy state and federal reporting requirements.

In the event payment is postponed for more than 31 calendar days from the latest of items (a), (b) or (c) above, the annual rate of interest during the period of postponement (beginning on the 32nd day until the date of payment) will be equal to the interest rate described above, plus 10%.

**4.03    How are death proceeds paid?** The death proceeds are paid in a single sum unless a settlement option has been selected. We reserve the right to pay proceeds to an estate or other entity in a single sum. Payment is subject to the rights of any assignee of record.

You may select a settlement option while the Insured is living by Authorized Request. The written consent of each Irrevocable Beneficiary and assignee, if any, will be required at the time of selection.

Generally, a Beneficiary can select a settlement option only after the Insured's death. However, you may designate that a Beneficiary is not permitted to change a settlement option you have selected.

**4.04** **When do maturity proceeds become payable and what is the amount payable?** The maturity proceeds of this policy become payable to you if the Insured is living on the Maturity Date.

The amount payable as maturity proceeds is equal to the Face Amount shown on your Policy Data Page (or the amount of reduced paid up insurance, if applicable), minus any Indebtedness.

| SECTION 5. | BENEFICIARY |
|---|---|

**5.01** **Who is the Beneficiary?** The Beneficiary is named on your application, unless later changed as allowed by this policy.

There are different classes of Beneficiaries called primary and contingent. There can be more than one Beneficiary per class. The primary Beneficiaries will be paid equally unless otherwise specified. If there is no primary Beneficiary listed or all primary Beneficiaries predeceased the Insured, proceeds will be paid equally, unless otherwise specified, to the contingent Beneficiaries.

If no primary or contingent Beneficiary outlives the Insured, or if there is no named Beneficiary, the death proceeds will be paid in the following order:

a.) The Insured's spouse or Legal Partner, if living; otherwise
b.) Equally to the Insured's living lawful children, if any, as of the Insured's date of death, regardless of their age; otherwise
c.) To the Insured's estate.

The term "lawful children" includes the Insured's stepchildren, children born to the Insured, and the Insured's legally adopted children (or pending finalization of proposed adoption). Lawful children of the Insured's Legal Partner are considered the Insured's stepchildren.

**5.02** **Can the Beneficiary be changed?** Unless you indicate that the Beneficiary cannot be changed without the Beneficiary's consent (an Irrevocable Beneficiary), you can change the Beneficiary at any time by Authorized Request. The Authorized Request of each Irrevocable Beneficiary and assignee, if any, will be required as part of such Authorized Request.

A request for change of Beneficiary will, unless otherwise specified by you, take effect as of the date you signed the request. However, we will not be responsible for any payment made or other action taken before we record the request.

| SECTION 6. | OWNER |
|---|---|

**6.01** **Who is the Owner?** The Insured is the Owner unless it is otherwise specified in the application or subsequently changed as allowed under this policy. All the rights allowed under the policy may be exercised solely by the Owner.

If the Insured is not the Owner, ownership will pass automatically to the Insured on the date of the Owner's death. A change of ownership due to the death of the Owner will take effect on the date we receive Proof of Death.

In the event there is more than one Owner:

a.) All elections and other actions that may be taken by the Owner, according to the terms of the policy, require joint action by all such persons; and
b.) Death of Owner refers to the death of the last living Owner.



CU091175

OPPT_A

03648989   13405   P

897   12

6.02 **What are the Owner's rights and how does he or she exercise his or her rights?** Ownership rights include changing ownership, changing Beneficiaries, assigning the policy, and exercising all other rights and privileges allowed by the policy. Ownership rights may be exercised only during the Insured's lifetime by Authorized Request.

6.03 **How is ownership of this policy changed?** A change of Owner may be made at any time before the Insured's death by Authorized Request. The Authorized Request of each Irrevocable Beneficiary and assignee, if any, will be required as part of such Authorized Request. The request for change of Owner, unless otherwise specified by you, will take effect as of the date the request was signed. The change will be subject to any payment made or action taken before the request is recorded.

| SECTION 7. | LOANS |
|---|---|

7.01 **Are loans available?** While your policy is in force, an amount up to the loan value may be borrowed during the Insured's lifetime by Authorized Request. Loans cannot be made if your policy is in force as extended term insurance. The Authorized Request of each Irrevocable Beneficiary and assignee, if any, is required as part of such Authorized Request. Your policy is the sole security for the loan. Any Indebtedness will reduce the amount payable upon surrender, death or maturity.

The loan value will be determined as of the loan date. The loan date is the date we process the loan request. We reserve the right to postpone making the loan for up to six months unless it is to be used under the automatic premium loan option.

Interest on the loan accrues daily and becomes a part of the loan. The interest rate we charge for loans may be changed, but not more often than once a year. The rate, if changed, will never be more than 8% per year and will apply only to loans made on or after the effective date of the rate change.

While your policy is in force, any Indebtedness may be repaid. If your total Indebtedness equals or exceeds your cash value, coverage will terminate and your policy will become void. A notice will be mailed to the last known address of the Owner and any assignee at least 30 days prior to termination of your coverage.

7.02 **What is the maximum amount available for a loan?** The maximum amount available for a loan is referred to as the loan value. Your loan value is equal to:

    a.) Your cash value as of your next Policy Anniversary;
    b.) Minus any existing Indebtedness;
    c.) Minus loan interest to the next Policy Anniversary;
    d.) Minus any premiums due and unpaid as of the loan date;
    e.) Minus premiums payable, if any, from the loan date to the next Policy Anniversary.

The cash value (described in item a. above) is calculated assuming that all premium payments are made to your next Policy Anniversary.

7.03 **What is the automatic premium loan option?** The automatic premium loan option allows a loan to be made automatically to pay each premium unpaid at the end of the grace period. If the loan value is not sufficient to pay the past due premium (based on your current payment mode), we will change your payment mode to a more frequent mode, and a loan will be made to pay the past due premium. If the loan value is not sufficient to pay at least one monthly premium, the automatic premium loan option will not be available.

You may select or cancel this option by Authorized Request before the due date of any unpaid premium.

ICC17-SIWLLB

| SECTION 8. | CASH VALUE AND POLICY SURRENDER |
|---|---|

**8.01** **What is the cash value of your policy?** The cash value of your policy, when all premiums due have been paid, is the guaranteed cash value shown on the Table of Guaranteed Policy Values on your Policy Data Page. The table shows the guaranteed cash value on certain Policy Anniversaries. Cash values can be calculated at any time during a Policy Year. In that case, allowance will be made for the period of time since the last Policy Anniversary and for any premiums paid for any part of that Policy Year.

The basis for calculating the cash value is shown on the Policy Data Page. We have filed a detailed description of the method used to calculate the guaranteed policy values with the Interstate Insurance Product Regulation Commission.

**8.02** **Can your policy be surrendered?** Your policy may be surrendered for its Net Cash Value by Authorized Request. Even if your policy is in force as extended term insurance or reduced paid-up insurance, it will have a cash value and can be surrendered at any time. If your policy becomes paid up by completion of all premium payments, we will pay the cash value upon surrender. The Authorized Request of each Irrevocable Beneficiary and assignee, if any, will be required as part of such Authorized Request for surrender.

The surrender date of your policy is the date we receive your Authorized Request. The Net Cash Value will be determined as of the surrender date. If the surrender date is within 30 days following a Policy Anniversary the cash value used to determine the Net Cash Value will not be less than the cash value on that Policy Anniversary. Any premium paid beyond the surrender date will be returned with the Net Cash Value. Your coverage under this policy will terminate as of the surrender date and your policy will become void.

We reserve the right to postpone payment for up to six months from the date we receive your request to surrender your policy.

| SECTION 9. | GENERAL PROVISIONS |
|---|---|

**9.01** **What does the entire contract consist of?** This policy, any attached riders, endorsement(s), and/or amendments, and any application attached to the policy, are the entire contract between you and us.

No one except a Company officer can change or give up any of the rights or requirements in this policy. Any change must be in writing.

We will accept statements made in any application or reinstatement application, in the absence of fraud, to be representations and not warranties.

**9.02** **When does your policy become incontestable?** This policy is incontestable after it has been in force during the Insured's lifetime for two years from the effective date or reinstatement date. Statements made in the application or reinstatement application will not be used by us to void your policy or challenge a claim, unless the statement is material, is contained in your application that is attached to your policy, and within the contestable period.

After this 2-year period, we cannot contest coverage except for:
a.) Non-payment of premiums; or
b.) Fraud in the procurement of the policy or reinstated policy, if permitted by applicable law in the state where the policy is delivered.

If this policy is void as a result of a contest, the premiums you paid for this policy will be refunded to you without interest.



**9.03** **What if the Insured's Age or gender has been misstated?** If the Insured's Age or gender is misstated, we will adjust the amount payable and other benefits. This adjustment will be based on what the premium would have purchased at the correct Age or gender. If the correct Age is not within the issue Age range for this policy, the premium and benefits will be determined by us using extrapolation. Extrapolation is a method of mathematically calculating the values in a logical manner, based on the known values.

**9.04  Can your benefits be assigned?** You may assign the benefits provided by this policy. In order for us to honor the assignment, we must receive notice of your assignment which includes your signature as well as that of each Irrevocable Beneficiary. Assignments, unless otherwise specified by you, will take effect on the date the notice of assignment is signed by you, subject to any payments made or action taken by us prior to receipt of notice. We are not responsible for the validity or effect of the assignment.

**9.05  Is there a reduction in benefits for deaths caused by suicide?** Suicide by the Insured, while sane or insane, within two years of the policy effective date or reinstatement date will result in reduced death proceeds. If the Insured dies by suicide during this 2-year period, the death proceeds payable to your Beneficiary will be limited to the premiums paid, less any Indebtedness.

**9.06  Who approved this policy?** This policy was approved under the authority of the Interstate Insurance Product Regulation Commission Standards (IIPRC) and issued under the commission standards. Any provision within this policy that is in conflict with the IIPRC standards for this product type is hereby amended to conform to the IIPRC standards for this product type as of the policy's effective date.

**9.07  Can we modify your policy?** Your policy may be modified by us if such modification is necessary to comply with the Internal Revenue Code or any other applicable law, regulation or interpretation in order to continue treatment of the policy as life insurance. We will notify you if such modification is required. When required by law, we will obtain your approval and the approval from the appropriate regulatory authority for such modification(s).

| SECTION 10. | NONFORFEITURE OPTIONS |
| --- | --- |

**10.01  What are your nonforfeiture options?** If you terminate this policy or stop paying premiums after your policy has cash value, you may elect one of the nonforfeiture options described below by Authorized Request. The written consent of each Irrevocable Beneficiary and assignee, if any, is required as part of such Authorized Request.

If no Authorized Request is received from you within 60 days after the premium due date, the automatic nonforfeiture option will be Option 1, Extended Term Insurance.

Allowance for the period of time since the last Policy Anniversary and for any premiums paid since the preceding Policy Anniversary will be included in the calculation of the value that is applied to a nonforfeiture option.

**Option 1: Extended Term Insurance.** Your Net Cash Value will be used to purchase extended term insurance. The amount of the term insurance will be equal to the Face Amount shown on your Policy Data Page less any Indebtedness. The length of the term period will be determined as of the due date of the unpaid premium. It will be based on your Net Cash Value and the net single premium at the Insured's Age on that date.

**Option 2: Reduced Paid-Up Life Insurance.** Your cash value will be used to purchase paid-up insurance with the same Maturity Date as the policy. The amount of the paid-up insurance will be what the cash value can buy as a net single premium, based on the Insured's Age as of the due date of the unpaid premium. Any Indebtedness that is not repaid at the time of the change to reduced paid-up insurance will be continued on the reduced paid-up policy.

**Option 3: Surrender For Cash.** You may surrender your policy for its Net Cash Value as provided in Section 8.

| SECTION 11. | SETTLEMENT OPTIONS |
| --- | --- |

**11.01  What are the optional modes of settlement at the Insured's death?** There are two optional modes of settlement available for payment of proceeds. They are described below. Other options may be available upon agreement between you and us. The minimum amount which can be applied under these options is the greater of $5,000, or the amount required to provide monthly payments of $50. If an optional mode of settlement is not selected before the Insured's death, your Beneficiary may make such selection by Authorized Request.

The rates shown in the tables below are used to determine the minimum monthly payments. If higher current rates are applicable, you will receive the higher rate. Current rates will be provided upon request. Current rates will not be less than the rates that would be offered by us if the proceeds were used to purchase a single premium immediate annuity.

**Option 1 – Installment Option.** We will pay equal monthly payments for a chosen number of years, not less than 5 nor more than 30. If the original payee (your Beneficiary) dies before payments have been made for the chosen number of years:

a.) Payments will be continued for the remainder of the period to the successor payee; or
b.) The present value of the remaining payments, computed at the interest rate used to create the Option 1 rates, will be paid to the successor payee or to the last surviving payee's estate, if there is no successor payee.

The amount of each monthly payment for each $1,000 of proceeds applied under this option is shown in the following table:

| Number of Years | Monthly Payment |
|-----------------|-----------------|
| 5 | 17.08 |
| 10 | 8.75 |
| 15 | 5.98 |
| 20 | 4.59 |
| 25 | 3.76 |
| 30 | 3.21 |

The Option 1 rates are based on 1% interest per year.

**Option 2 – Life Income - Specified Guarantee Period Certain.** We will pay monthly payments for as long as the payee lives. We will require satisfactory proof of the payee's Age and gender. If the original payee (your Beneficiary) dies before all of the payments have been made for the specified guaranteed period certain:

a.) Payments will be continued during the remainder of the guaranteed period certain to the successor payee; or
b.) The present value of the remaining payments, computed at the interest rate used to create the Option 2 rates, will be paid to the successor payee or to the last surviving payee's estate, if there is no successor payee.

The specified guaranteed period certain choices are:

a.) 0 years (life income only);
b.) 10 years; or
c.) 20 years.

The amount of each monthly payment for each $1,000 of proceeds applied under this option is shown in the following table:

| Years | MALE | | | | | FEMALE | | | | |
|-------|------|------|------|------|------|--------|------|------|------|------|
| | Ages | | | | | Ages | | | | |
| | 55 | 60 | 65 | 70 | 75 | 55 | 60 | 65 | 70 | 75 |
| 0 | 3.37 | 3.89 | 4.58 | 5.54 | 6.87 | 3.08 | 3.52 | 4.11 | 4.93 | 6.12 |
| 10 | 3.34 | 3.82 | 4.43 | 5.20 | 6.08 | 3.06 | 3.49 | 4.03 | 4.75 | 5.66 |
| 20 | 3.20 | 3.55 | 3.90 | 4.21 | 4.43 | 2.99 | 3.34 | 3.72 | 4.09 | 4.37 |

These monthly payments are based on the Annuity 2000 Mortality Tables with compound interest at an effective rate of 1%. Monthly payments for any period or Age not shown, if allowed by us, will be calculated on an actuarially equivalent basis and will be furnished upon request.

8900004080954          23351     CU034-1220-0          LC2455046          $303.50

 TruStage®

## APPLICATION FOR TruStage Individual Whole Life Insurance

CMFG Life Insurance Company
P.O. Box 61, 2000 Heritage Way
Waverly, IA 50677-0061
1-888-787-8243 or visit TruStage.com

### APPLICANT COVERAGE

JOHNNY R TRAVIS

929 MCKINLEY AVE

AKRON OH 44306

Primary phone  (330) 573-6015

Email address

Date of birth �altered altered          Gender ☒ Male  ☐ Female

Social Security Number ▰▰▰▰

Select the amount of Whole Coverage

☒ $50,000

Check here only if you do **not** want the automatic
premium loan provision.* (see back) ☐

### EXISTING INSURANCE AND REPLACEMENT INFORMATION

Do you have any existing life insurance policies or annuity contracts with our company or any other company?   ☐ YES  ☒ NO

Will the coverage applied for replace, discontinue, or change any existing life coverage or annuities in this or any other company?   ☐ YES  ☒ NO

| Name of company | Amount | Type of coverage | Policy number |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

### BENEFICIARY INFORMATION

| Beneficiary Name(s) | Relationship to You |
|---|---|
| Lamard Richardson- Primary | Relative-100.0% |
|  |  |
|  |  |

### HEALTH INFORMATION

**Please answer these questions**

1) Are you unable to work or perform normal activities due to a chronic illness or permanent injury?   ☐ YES  ☒ NO

2) Have you, within the past 5 years, been treated for or diagnosed by a medical professional with the following: (check all that apply)   ☐ YES  ☒ NO

☐ HIV or AIDS
☐ Diabetes Requiring Insulin
☐ Alcohol or Drug Abuse
☐ Chronic Depression

☐ Cancer (except basal cell)
☐ Stroke
☐ Chronic Liver Disease
☐ Mental Disorder

☐ Heart Disease/Condition (except high blood pressure)
☐ Chronic Disorder of the Brain or Spinal Nerve
☐ Chronic Kidney Disease
☐ Chronic Lung Condition



**IMPORTANT** ▶ COMPLETE OTHER SIDE



ISWLL21 ISWLN21-B1 0122

ICC17-SIWLAPP

Approval is based upon your health and other factors affecting your insurability.

## PAYMENT

**Deduct**
- ☒ Monthly
- ☐ Quarterly
- ☐ Semi-annually
- ☐ Annually

**Option 1\*** Deduct from my
- ☐ Checking Account
- ☐ Savings Account

**Option 2\*** Deduct from my
- ☒ Credit/Debit Card
  (MC/VISA/Discover Only)

Routing # _____

Account # _____

Financial Institution name _____

Account # XXXX-XXXX-XXXX-1608 _____ Expiration date 12/2025

Name of card holder Johnny Travis

Special remarks 2146401096

Choose your automatic premium deduction date _____
Payments typically process in 1-3 business days (excluding weekends and holidays).

\*I authorize by signing below, CMFG Life Insurance Company to deduct premiums from the account I've selected for the life coverage applied for on this application. This authorization will remain in effect until revoked by me in writing or by phone.

If you leave this section blank, you will receive a bill.

**Option 3**
- ☐ Please send me a bill.

## AGREEMENT

I authorize by signing below, that I agree to all **four** of the following statements:

1. I authorize that all my statements and answers are true to the best of my knowledge and belief. This application and any supplemental application(s) will be the basis of any insurance issued. I understand: (1) benefits may be denied during the first 2 years from the effective date if I fail to give true and complete answers in this application, as described in the incontestability provision of the policy; and (2) this insurance becomes effective only if: a.) my application is approved and a policy issued; b.) my first full premium due is received while I am alive and within 21 days of my policy's effective date; and c.) answers to questions concerning my insurability are as stated in this application. Agents are not authorized to determine insurability, void, waive or change any terms of the application, or make a contract for the Company.

2. I authorize any health care providers, pharmacy benefit manager/pharmaceutical firm, insurance companies, consumer reporting agency, the Department of Motor Vehicles, financial institution, or employer with information about my physical or mental health condition, substance or alcohol use, STDs, diagnosis or treatment of Human Immunodeficiency Virus (HIV), prescription drug records, financial status, employment status, or other relevant information about me, to give all information (except psychiatric treatment notes) to CMFG Life Insurance Company ("Company") or its reinsurers to determine eligibility for insurance or benefits. Such information will be released only to reinsurers, persons performing business duties as delegated or contracted for by the Company related to my application and insurance-related functions, as permitted or required by law, or as I further authorize. Health information shared for these purposes is not subject to federal health information privacy laws; however state privacy laws do apply.

3. I agree this authorization is valid for 24 months or such a time limit as permitted in the state where the policy is delivered, a copy is as valid as the original, and I or my authorized representative can receive a copy upon request. For purposes of collecting information in connection with a claim for benefits, this Authorization is valid for the duration of the claim.

4. I understand: (1) I can revoke this authorization at any time by written request to the Company; (2) revocation of this authorization will not affect any prior action taken by the Company in reliance upon this authorization; and (3) failure to sign, or revocation of this authorization may impair the Company's ability to evaluate claims or process applications and may be a basis for denying this application or a claim for benefits. The Notice to Applicant has been received by me.

### SIGNATURE

Required Signature and Date Signed Authorizes Payment and Agreement

**JOHNNY R TRAVIS**

X _____  02/16/2022

Applicant's Signature                          Date Signed



**Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law.**

\*Automatic Premium Loan Provision: Allows you to borrow against any accumulated cash value from your policy to pay a premium and help prevent policy cancellation. We suggest that you keep this feature.

Ohio Department of Health
VITAL STATISTICS
**CERTIFICATE OF DEATH**

Primary. Reg. Dist. No. 7701
Registrar's No.       7700-2023005296
State File No. 2023104670

| DECEDENT | | | | |
|---|---|---|---|---|
| **1.** Decedent's Legal Name (First, Middle, Last, Suffix) (Include AKA's if any) JOHNNY RAY TRAVIS | | | **2.** Sex MALE | **3.** Date of Death (Mo/Day/Year) OCTOBER 24, 2023 |

| **4.** Social Security Number [redacted] | **5a.** Age (Years) 69 | **5b.** Under 1 Year Months Days | **5c.** Under 1 day Hours Minutes | **6.** Date of Birth (Mo/Day/Year) [redacted] | **7.** Birthplace (City and State or Foreign Country) CLEVELAND, OHIO |
|---|---|---|---|---|---|

| **8a.** Residence State OHIO | **8b.** County SUMMIT | **8c.** City or Town AKRON |
|---|---|---|

| **8d.** Street Address and Zip Code 929 MCKINLEY AVE 44306 | **9.** Ever in US Armed Forces? NO |
|---|---|

| **10.** Marital Status at Time of Death DIVORCED (AND NOT REMARRIED) | **11.** Surviving Spouse's Name (if wife, give name prior to first marriage) |
|---|---|

| **12.** Decedent's Education HIGH SCHOOL GRADUATE OR GED | **13.** Decedent of Hispanic Origin NO | **14.** Decedent's Race BLACK |
|---|---|---|

| **15.** Father's Name LUE JAMES TRAVIS | **16.** Mother's Name (prior to first marriage) AUGSTAVIA HANNAH |
|---|---|

| **17a.** Informant's Name JAMES BOYER | **17b.** Relationship to Decedent BROTHER | **17c.** Mailing Address (Street and Number, City, State, Zip Code) 1195 TRENTWOOD DR AKRON, OHIO 44313 |
|---|---|---|

| **18a.** Place of Death DECEDENT'S HOME | **18b.** City or Town, State and Zip Code AKRON, OH 44306 | **18d.** County of Death SUMMIT |
|---|---|---|
| **18b.** Facility Name (if not institution, give street and number) 929 MCKINLEY AVE | | |

| DISPOSITION | |
|---|---|
| **19.** Funeral Service Licensee or Other Agent MARCH FERGUSON | **20.** License Number (of licensee) 009193 | **21.** Name and Complete Address of Funeral Facility RHODEN MEMORIAL HOME INC 1101 PALMETTO AVE AKRON, OH 44306 |
| **22.** Method and Place of Disposition BURIAL - AKRON RURAL CEMETERY ASSOC., AKRON, OH | | |
| **23.** Local Registrar TAWANDA WEEMS | **24.** Date Filed (Month/Day/Year) OCTOBER 27, 2023 | |

| CERTIFIER | |
|---|---|
| **25a.** Certifier (Check only one) ☒ Certifying Physician: To the best of my knowledge, death occurred at the time, date, and place, and due to the cause(s) and manner stated. ☐ Coroner or Medical Examiner: On the basis of examination and/or investigation, in my opinion, death occurred at the time, date, and place, and due to the cause(s) and manner stated. | |
| **25b.** Time of Death 14:42 | **25c.** Date Pronounced Dead (Month/Day/Year) OCTOBER 24, 2023 | **25d.** Was Case Referred to Medical Examiner or Coroner? NO |
| **25e.** Certifier Name and Title KAMAL DAYAL        MD | **25f.** License number 35.134167 | **25g.** Date Signed (Month/Day/Year) OCTOBER 27, 2023 |
| **27.** Name and Address of Person who Completed Cause of Death KAMAL DAYAL, 55 ARCH ST, SUITE 1A, AKRON, OH 44304 | | |

| CAUSE OF DEATH | | |
|---|---|---|
| **28.** Part I. Enter the disease, injuries, or complications that caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest, shock, or heart failure. List only one cause on each line. Type or print in permanent blue or black ink. | | Approximate Interval: Onset and Death |
| Immediate Cause (Final disease or condition resulting in death) | a. HEART FAILURE WITH REDUCED EJECTION FRACTION | 5 YEARS |
| Sequentially list conditions, if any, leading to immediate cause. | b. Due to (or as Consequence of) NON ISCHEMIC CARDIOMYOPATHY | 5 YEARS |
| Enter Underlying Cause (Disease or Injury that initiated events resulting in a death) | c. Due to (or as Consequence of) PAST ALCOHOL ABUSE | 10 YEARS |
| | d. Due to (or as Consequence of) | |

| Part II. Other significant conditions contributing to death but not resulting in the underlying cause given in Part I. TYPE 2 DIABETES, HYPERLIPIDEMIA | **29a.** Was An Autopsy Performed? NO | **29b.** Were Autopsy Findings Available Prior To Completion Of Cause of Death? NOT APPLICABLE |
|---|---|---|

| **30.** Did Tobacco Use Contribute to Death? NO | **31.** If Female, Pregnancy Status NOT APPLICABLE. | **32.** Manner of Death NATURAL |
|---|---|---|

| INJURY | | | |
|---|---|---|---|
| **33a.** Date of Injury (Mo/Day/Year) | **33b.** Time of Injury | **33c.** Place of Injury (e.g., Decedent's home, construction site, restaurant, wooded area) | **33d.** Injury at Work? |
| **33e.** Location of Injury (Street and Number or Rural Route Number, City or Town, State) | | | |
| **33f.** Describe How Injury Occurred: | | **33g.** If Transportation Injury, Specify: | |

HEA 2724    Rev. 09/18





Tawanda M Weems
Local Registrar

OCT 31 2023

*Tawanda M. Weems*



 **TruStage**™

PO Box 61 • Waverly, IA 50677-0061

**Important Claim Notice**

1-000-90040286100-0000019-001-5-1-1-000-000-000-000
Lamard Richardson
1977 Wells Creek Run
Akron OH 44312



EXHIBIT

**3**

# Claim Documentation Requested

Action is needed to review and process your claim.

**CERTIFICATE / POLICY NUMBER:**
LC2455046

**CLAIM NUMBER:**
231030013

**INSURED NAME:**
JOHNNY TRAVIS

**NOVEMBER 29, 2023**

Dear Lamard Richardson,

We are committed to assisting you with your claims process and recognize this may be a difficult time. This letter is to let you know that as of November 29, 2023, we have not received the documentation needed to process your claim.

The following information is still needed to complete your claim request:

- Please do not send photographs of requested documents. The quality of the images when printed and/or faxed are often too dark. Medical offices historically reject photographs of documents advising that the documents are not legible. ·
- Release of records from a facility within the state of Ohio for a deceased patient must be accompanied by either the Certificate of Appointment issued by Ohio Probate Courts or a Probated Will that has been certified by the Ohio Probate Courts
- We have received an assignment from Express Funeral Funding in the amount of $9,551.62 signed by Lamard Richardson. When a claim decision is reached proceeds or refund of premiums paid will be issued to Express Funeral Funding in accordance with the assignment unless a release of assignment is received prior to the date of decision.

The requested documentation can be submitted using any of the below options for your convenience. Please reference your claim number 231030013 to assist with processing.

ONLINE:   consumerclaim.trustage.com/document-upload
EMAIL:    ClaimsInfo@trustage.com
MAIL:     TruStage PO Box 61, Waverly, IA 50677-0061
FAX:      608.236.8030

When we receive the required information, we will determine whether benefits are payable and send you a written update, or we will be in touch to let you know if additional information is needed.

We are here to support and assist you with this claim process. If you have questions regarding this claim, please contact me at 800.779.5433 ext. 4832339  or you can email* me at ClaimsInfo@trustage.com.

TruStage™ Insurance is issued by CMFG Life Insurance Company, part of TruStage Financial Group, Inc.

*To protect your and the insured's privacy, we encourage you to send your documentation via the secured email of your preference. Sending an email or attachments is not secure unless you take the extra step to send it via a secure method.

Sincerely,

Claims Department
TruStage™